Well, I was saying I was pleased to be sitting with Judge Christin on my right and Judge Bea looking dapper on the big screen. So this case is set for 15 minutes per side. For appellant, we have Shanice Scarlett. Is that right? I represent the Plaintiff Appellee Class, Your Honor. Okay, and for Mr. Irwin, the objector? Oh, okay. We have Mr. Robert Chen for the objector, Mr. Irwin. Robert Kloer, Your Honor. Okay, Mr. Kloer. We'll start with Mr. Kloer's argument. The case is set for 15 minutes per side. So, Mr. Kloer, if you think you want to make a rebuttal argument, I'd say do your best to stop before all your time is up. But, of course, answer any judge questions fully. And if you need a little extra time, I'm sort of a softy, so just ask for it and you'll get it. Yes, Your Honor. Please proceed. Thank you. Hello. Good afternoon, everyone. My name is Robert Kloer. I represent the appellant, Connor Irwin. This Court in Rodriguez recognized that district courts have a special duty to consider violations of the rules of ethics and breaches of the duty of loyalty when awarding attorney's fees in class actions. Connor Irwin believes that the district court reversibly erred in failing to consider violations of the California Rules of Professional Conduct and corresponding breaches of fiduciary duty. Specifically, Rule 1.15 A and C, which require attorneys to place disputed attorney's fees into client trust accounts. Rule 1.15 D, which required the prompt return of client property. And Rule 1.7, which requires conflict-free representation. Hoggins-Berman withheld $52.8 million in attorney's fees that this Court vacated for more than a year over Irwin's protest. And then once we sought to have the fees returned to the settlement accounts, we discovered that, in fact, those funds were never placed in client trust accounts as required by the rules. This in the context of having concealed the bid that would have awarded them less than half of what they ultimately recovered, and then when ultimately disclosing some terms of the bid, misleading the courts as to what the bid would have entitled to them. Counsel, we have authority in similar cases where we have said that ethics issues are really not within our bailiwick so much, and that we're aiming to get a correct fee award entered, and that that should be our priority. So my question is whether or not you can show that your client was prejudiced by this. I think we can show that the entire class was prejudiced. Because? So number one, all of the funds should have been in client trust from day one, earning interest. And when this Court vacated the entire $52.8 million, all of those funds, all of the interest accrued up to that point would have gone to the class and not to Hoggins-Berman. So what the district court did was award the difference, which was $21.8 million. It required them to pay back interest on the difference. And we're talking about hundreds of thousands of dollars that should have gone to class but did not. So there is concrete harm. The class wound up recovering $31 million. Forgive me, the fee award ultimately was reduced to $31 million or some such number. Correct. And the class, whatever remaining portion of the, I'm going to round these numbers, $205 million, received the interest on that, right? The class received the interest on the difference. Correct. So what's your strongest authority for the notion that the class is entitled to the interest on the entire amount that you contend should have been in a trust account? Well, first of all, California Rule 1.15a that requires the funds to have been placed immediately is upon dispute, which was at the outset for each award. So they should have been earning interest. And then my authority for the fact that that interest collected doesn't belong to the attorneys is attorneys are never entitled to fees on vacated. Why should they be entitled to fees on vacated? Why should they be entitled to interest on fees that don't belong to them, the fees that were vacated or eliminated? Wouldn't they be entitled, counsel, to interest on the fees that are properly allocated to them? Correct. Yes, I do think they would. But the problem was that when this court vacated all $52.8 million at that juncture, none of the interest belonged to them. And so that interest was due promptly to the class. But if we go along with your calculations, the interest would all go to the class. And then we would take some interest out of there to compensate for the $31 million or $26 million or whatever we decide for the attorney's fees. So I go along with Judge Christin, what harm, what foul here? Because they wouldn't have been entitled to any interest until new interest would accrue from the date after vacature. All that time leading up to that, they weren't entitled to any of those fees. There were no, as of May 15th, 2020, or at least by this court's denial of rehearing, there were no attorney's fees. So there could be no interest. Why wouldn't they be entitled to attorney's fees from the very beginning in the amount that is properly determined to be attorney's fees? Because there was no order entitling them to do so. There was no extant order to which they could claim entitlement to fees until the court issued a renewed fee order. But we know that now. And so hence the question that Judge Bay is asking. We know that now, that they were entitled to it. And we know the amount. So again, I don't understand why there's prejudice to your clients. Okay. So it sounds like you're fundamentally disagreeing with my premise, which is that once the fees were vacated, everything was wiped out. There is no order. Immediately that interest is due. We're talking about several hundreds of thousands of dollars that were not returned to the class. The district court only asked them to return approximately $300,000. It would have been well over $600,000. So that's a prejudice. Okay. In addition, if they had placed those funds in client trust, they could have promptly- Go ahead, counsel. So, sorry for the delay, but Mr. Kluwer can continue finally. Okay, thank you. Judge Bay, can you hear? Yes, I can hear you, but I can't hear Judge Gould very well. Okay. Can you bring the mic closer? Drive me closer. Okay, Judge Bayer. I can hear you fine now. Okay. Okay. If I may resume, I believe we were talking about harm. In Rodriguez, this court upheld a complete forfeiture despite the absence of any harm. And Judge Bayer's opinion in Berthelsen is also a no harm, no foul case. And in that case, there really was no argument that there was any prejudice. And we believe that difference in interest is a concrete harm. And that when the new fee was awarded, it didn't reinstate the old fee retroactively in such a way that would have entitled them to the interest that would have accrued. It's our position that upon the vacature, only then would Hugginsburg be entitled to interest on the fee. But even if this court concludes that there is no harm to the class, in Berthelsen, this court only affirmed because the district court provided multiple sound reasons for denying the forfeiture. It went through the relevant considerations for forfeiture and only then arrived at the conclusion that it was unnecessary. And in this case, we were provided nothing. There was no analysis. We submitted our arguments as to why this is an egregious violation, the severity of the violation, the timing of the violation, and the fees. And the district court essentially said we did not show our entitlement to forfeiture. And it's our belief that's not enough, especially considering the egregiousness of what we see as violations. Counselor, are you arguing that the district court was required to decide whether there was an ethical violation? Yes, we do. That's our position, that is, especially in the context of a class action setting. But it was error for him to not decide it. Is that right? Yes, under Rodriguez. We recognize that we're asking, it's a tall order to ask for forfeiture for a case in which class counsel achieved $205 million in settlements, but it's our belief that- Where there was no liability. Right, ultimately there was no liability. But, and as in the footnote in Rodriguez, look, results do not justify violations of the rules of ethics. And so we believe a strong penalty would be proportionate to the severity of violations in this case. They kept client property for more than a year, disregarded the safekeeping rules, and have exhibited and demonstrated a lack of candor as recognized by the district court throughout the process. As it stands, they recovered nearly their complete lodestar without so much as a slap on the wrist. And so we've asked for the court to exercise its supervisory powers. You know, and of course, in any alternative we would be fine with a remand. But I think this case is appropriate for that sort of relief because it does affect the administration of justice. If there is a perception that class action attorneys, there's an exception to the safekeeping rules, that class action attorneys can bypass the safekeeping rules. It presents opportunity and almost an invitation for abuse. And it would also serve the interest of judicial economy by avoiding any potential subsequent appeal. And there's a complete record before the court on the issue of forfeiture and on the violations. And then I guess I'll reserve my time. Counsel, what's your best case, federal published case, that would uphold a forfeiture of fees in this magnitude because of an ethical violation? So I don't think that probably the Rodriguez case, which involved $49 million in settlements, and there was a complete forfeiture there. But so part of the problem there is that no attorneys have ever been, as far as we could find in the research, no attorneys have ever been accused of wrongfully withholding $52 million in attorney's fees that had been vacated and with really no justification. So I don't have a case on point because, as far as I can tell, it hasn't happened before. I'll reserve my remaining time unless your honors have any more questions. Thank you. Good afternoon, your honors. I'm Shanna Scarlett. I represent the plaintiff appellee and direct purchaser class. I'm a partner at the law firm of Hawkins Berman who worked with class counsel in this case. Thank you for letting me appear by video today, despite the difficulties earlier. To allow the forfeiture of fees in this case, Objector Irwin asked that the court, would require three things from the court. For this court to overlook waiver, the fact that these quick pay provisions in the settlement agreements were apparent when the court gave final approval to the district court in 2016, 2017, again in 2018. Other objectors objected to these provisions and Mr. Irwin did not. It would require this court to overturn decades of case law allowing quick pay provisions in the class action context and which provides district courts great discretion in terms of the amount of attorney's fees, but also the timing of the payment of these fees. And it would require this court to disturb the discretion of Judge Seaborg in finding, after overseeing this MDL for 10 years and observing the conduct of all of the parties for 10 years, that Hawkins Berman had complied with the terms of the settlement agreement and complied with the repayment of fees as ordered by the court, which required the entire amount plus interest as your honors have noticed. Even if this court found all of this, Objector Irwin asked this court to broadly apply the rules of professional conduct to class actions in a way that's contrary to other case law and contrary to the language of the rules itself. As this court's already noted, there's no prejudice. The money was returned promptly. There was interest paid. Hawkins Berman has complied with every order of the court and still today continues to litigate on behalf of the class overseeing distribution of the $205 million and at this point without compensation. Obviously, our lodestar at the time we submitted it was $30 million, but we continue to respond to class members on a weekly basis. We are working with the vendors to make sure that money is given back to the class members from the $205 that was recovered from the defendants and all of this is uncompensated. Irwin also argues that the award given to Hawkins Berman was in excess. Of course, this court's jurisprudence is clear on one thing and that is that in awarding fees to class counsel, the district courts must take into account all of the circumstances of the case and Judge Seaborg did that here when he awarded in the end $31 million in attorney's fees, which is only 14% of the $205 million that was recovered on behalf of the class and which was roughly equivalent to the lodestar of $30 million at the time of the fee submission. He was well within his discretion as the judge overseeing a very complex and lengthy MDL. Counsel, if I can interject a question. You will agree that in our prior decision written by Judge Kristen, we said the starting point should be the schedule that was submitted in the sealed bid and that starting point was a sliding scale, which allowed the first $5 million to be recovered without any fee being charged. My calculation is that if the starting point were used and allowing for the sliding scale to be used, when you grant the discretion for Judge Seaborg to up the fee by 20% because of the length of the proceedings, one comes to a figure of, I think it's $26 million instead of $31 million. It's $26,646,000 with a difference of $4,380,000 because Judge Seaborg did not start on the sliding scale that was in writing and was the bid. Why should he not vacate that $31 million and remand it and have Judge Seaborg do the correct computation with the sliding scale rather than allow it to remain? Your Honor, thank you for asking that question. The bid that was submitted was intended as Judge Seaborg interpreted it, which is based on flat rates. It's at Excerpt of Record 341. In the precursor sentence, it says, based on recovery from each defendant at various stages of the case. The intention of the bid was as Judge Seaborg interpreted, which is, say, for example, we had settled with Toshiba for $2 million. We would not have recovered any fees on that amount. But to the extent there was recovery of $25 million, then the fee award would have gone into a different category, and it depended on the stage of the case. Judge Seaborg heard the objections from class members, the argument that it should have been based on marginal rates and not flat rates. However, he found that there was no evidence in the record to contradict that flat rates were what was intended, and that is how he reached the fee award that he gave and his starting place. Well, you will agree with me that the evidence in the record is the schedule, which is the sliding scale schedule, correct? That is correct. That's what's in writing. And I think you might agree with me that the interpretation of written instruments is a legal question which the judge should interpret by himself and which is reviewed de novo for abuse of discretion, correct? Your Honor, I would only push back, I think, Your Honor, that it's within the abuse of discretion standard, given that Judge Seaborg had overseen this MDL for set the length of period of time. He was aware of the prior holdings of Judge Walker in the Northern District of California, and he held that there was no indication that Judge Walker applied the marginal structure in this case or that he appointed Huggins-Berman with the understanding it was a marginal rate structure. Regardless of how Judge Walker did it in other cases, the question I have in mind is this. We have a written instrument which is interpreted by judges as a legal question, and that is the expressed intent of the parties. Why isn't Judge Seaborg wrong in using a flat basis rather than a sliding scale basis based on the schedule we have before us? Your Honor, I agree that the free proposal found at ER 341 is one piece of it, but Judge Seaborg also went further and made certain findings of facts regarding whether or not we, Huggins-Berman, had made an adequate showing that we intended to use the flat rate structure. So, while I understand Your Honor's question that this is… that it was used by Judge Seaborg to interpret the writing which we have before us? I understand. What factual evidence was there? First of all, are you saying that the written document is ambiguous and requires factual findings to interpret it? No, Your Honor. It's our position that it is clear, especially given the lead-in sentence saying that it was proposed based on recovery from each defendant at various stages of the case. So, we believe it's clear on its face. But in addition to that, Judge Seaborg did go further and make the findings that we had made an adequate showing we intended it to be a flat rate structure.  My understanding is that per our prior panel opinion, which vacated the $52.8 million fee award and said that a starting place should have been hemmed in by the bid amount, the district court took that bid amount and then upgraded it or enhanced it by 20%. Is that right? That is correct, Your Honor. So, my question is, I wanted to know what were the factors that were considered in making a 20% increase in the bid amount? Your Honor, I think what— And how much money also of the $32.8 million, or rather $31 million, of the $31 million total new award, how much of that is based on the 20% increase? Your Honor, Judge Seaborg held that while certain events were in general contemplated at the time of the bid in 2010, that that had not sufficiently accounted for the level and the length of this litigation. It was one of the most contentious pieces of litigation, I think, that he'd seen in his years on the bench and certainly one of the most contentious that I've participated in. Some of the factors that gave him the comfort of giving the 20% award above what was contemplated in the fee proposal included that the enhanced award was close to the $30 million road star, the lack of any multiplier to class counsel so that there was no windfall, the fact that summary judgment had been entered against the class, and so the claims were found to have a $0 legal basis. And then he looked at the work that was unforeseen in 2010 at the time of the leadership proposal. That included an enormous amount of pass-through evidence that had not previously been undertaken in this type of indirect purchaser case. There were 100 subpoenas sent out to participants in the distribution channel, which is two times more than any prior case. There were 194 million pass-through estimates in the expert reports, again, far in excess of any case previously and not possibly contemplated in 2010. Daubert challenges had not been contemplated in 2010. It wasn't until the Supreme Court's opinion in 2011 in Dukes that it was clear to class counsel pretty much all over the country that Daubert would be now applied at class certification and be an extra set of motions that would be brought in addition and counter to the class certification motions. There were also further factual developments regarding hedonic regressions, which was a very unique piece of evidence that was used in this litigation to show that pass-through existed at initial price points. There was a motion to compel that was brought against Toshiba, one of the U.S.-based OEMs, and a huge amount of data was turned over after the first denial of the motion for class certification. Again, none of this type of work could possibly have been contemplated back in 2010. It wasn't even contemplated at the time of the first class certification motion, or we clearly would have included it on the first round. And second, there was a cointegration analysis done by the experts that utilized the entire defendant data set, something that hadn't been done previously in litigation and I'm not aware has been done since. Again, this was only brought with the second class certification motion, clearly not contemplated at the time of leadership and not even contemplated at the time of the first class certification motion because obviously we didn't bring it then. State counsel, thank you, but again, I want to know, of that $31 million, how many million of that represent the 20% increase? Your Honor, if I'm doing my math right, it would be roughly $6 million. It would be, I think, the award under the fee grid would be, I'm just trying to find my notes, would have been $25.9 million, essentially. So it would have been the $2 million, I mean, sorry, the terrible doing math on my feet, roughly $5 million, I want to say. But again, I'm rounding up, but those numbers would be in the record. Okay, thank you. Just briefly touching again on a little bit of other evidence that wasn't the record regarding the results achieved here. Direct purchaser cases in general usually settle for 2.5 times more than indirect purchaser actions. Here, the indirect purchaser class recovered double what the direct purchaser class did. We had an expert, Josh Davis, put in a declaration, which discussed some academic research he'd done about class certification outcomes in 100 class actions. In just two cases was a class certified after an initial denial, which is something that happened here. He also testified that two-thirds of antitrust class actions have final approval within five years. Here, there was nine years before final approval, with much higher costs than anticipated or seen in other antitrust class actions. Normally, they're between 1% and 2% of total recovery. Here, they were 2.5%. Counsel, your time is just about up. Could I ask a question, please? Did the district court rely on the grid? Yes, Your Honor. The district court extensively looked at the grid. I didn't ask that. Hold it. I didn't ask that. Forgive me, but my question is whether he relied on it. He clearly started with it. My question is whether he relied on the grid. Your Honor, I believe the answer is yes. There was a robust hearing that we discussed the grid extensively with him. There were objectors that had made the argument it should be marginal versus the flat rate. His order discusses the two alternatives extensively. Counsel, so that I can, forgive me for interrupting, but so that I can get you to focus on my, I'm looking at ER 13, 1 ER 13, note 4, where the judge said, while the difference that would result from interpreting the bid as requiring marginal rates is not de minimis, the bid itself would remain only a starting point. The amount awarded by the order is reasonable under all circumstances, regardless of the precise calculation of that starting point. The reason I'm asking this question is because your response to earlier questions by my colleagues and your argument strikes me as being really limited to the grid. And I read this, to just be clear, I read the judge's order here as telling us that he used it as a starting point and he did not consider himself bound by the grid. So your response is you think he did rely on the grid? Your Honor, I think that the judge tried to follow your guidance as best he could, which was to look at the totality of circumstances. He understood your instruction to be that the grid was the starting place. It's our belief that he looked at the grid using the flat rate to calculate the starting point and then looked at the totality of the factors. But I think in this footnote, he's indicating that he considered the award to be reasonable under all circumstances using his discretion, regardless of which starting point was used, either the marginal or the flat rate. Okay. And so that's the way I read this, too, and I'm not trying to be coy about it. It seems to me that that's what he's saying. But Judge Bea is raising a different point, which is per the grid, I think, if I can, I don't want to speak for Judge Bea, but there is certainly an argument to be made, Mr. Irwin made it, that the starting point under the grid could have called for no fees to be awarded for the first $5 million on each of those respective settlements. And if we decide that that's the correct reading of the or would have been the correct application of the grid, what would we do with that? Your Honors, certainly you could remand it back down to Judge Seaborg to consider further. It would be our position, though, that this Court's jurisprudence over decades in class actions has been that courts must consider the totality of the circumstances, and Judge Seaborg has tried to do that here, I think, as indicated by the footnote that you're pointing to, saying regardless of which starting point, the higher one under the flat rates, the lower one under marginal, he's done his best to come to a fee award that takes everything into account, which he believes is fair. Okay. So first time around, of course, the chart varies, but the bulk of this award sort of seemed to fall into the 12% or 13% range of these awards, I should say, the settlements. And the three prior approvals, settlements that were approved, were within, you know, much closer to the original benchmark, the traditional benchmark of 25%, 23.5% sort of in that range. I thought I calculated earlier that where Judge Seaborg wound up on remand was 15% of the overall recovery of the $205 million. I think the number you gave was 14. But at any rate, do I have that right when you're just taking a step back from me and saying that you think that he was reasonable under the circumstances? Am I right that you were at about 24%, 25% earlier, and you're now at you just mentioned 14%? I'd calculated 15%. Do I have that right? Your Honor, you do. And where I'm getting the 14% is that an award was made to Mr. Klor's law firm out of our attorney's fees award, and we had put that into the supplemental excerpts of record 1 point something million, if I'm recalling correctly, and that when you calculate that in, decreases the award to 14%. Okay. One final question, and thank you for your patience with my questions. There was one little settlement. These numbers are so big that to say little seems a little out of place. But there was one $5 million settlement, and I think there was no request for fees made on that at all. Is that right? That's correct, Your Honor. And if my memory is correct, that was the NEC settlement, and there was no request for fees given how it fell on the grid. Okay. So if you look at the grid, this will be a last question. If you look at the grid, then that $5 million would have not entitled you to the fees, regardless of the stage of the litigation, because the grid has a 0% rate at $5 million all the way across the board. But I think the way you've applied. That's right. Okay. So I think your application on remand is for. As to the other defendants, you have started with the left-hand column, right? And you did this on a defendant-by-defendant basis, not by defendant family. Is that right? No, Your Honor.  The defendant family is operated as one defendant in this case. Okay. So the $124.5, that family, then it would be 1, 2, 3, 4, 5. The sixth box down is where you started. Is that right? So, Your Honor, then I think we're miscommunicating. So there's three rounds of settlements. Yes. But those group together defendant families. And so NEC, for example, is one defendant. The TSST. I understand. I get that part. I wrote the opinion. I understand that. But I don't know that you're answering my question about how you applied it on remand. If you could cut to that, Chase, please. So every settlement would have had a dollar value that took into account the stage of the case and the amount per that defendant. So the Toshiba defendant family or the NEC defendant family. We would have gone down the grid for that number and applied. So a $25 million settlement, for example, reached from pleading through motion to dismiss, which would be the first column, we would have applied a 5% fee award. All right. That's how it was intended to be applied and how we applied it to come to our numbers. Okay. So our published opinion made note that there had been some inconsistency about the way Hagen's firm had applied this grid earlier on in the litigation. And then at page, I think it's 9. But at any rate, the published opinion says, the firm seems to have treated each of the four settlements comprising the first round recovery as separate awards rather than inputting the lump sum. Remember that sentence? Yes, Your Honor. Rather than inputting the component parts. And then we wrote, the text above the grid on the single unsealed page of the firm's proposal permits this approach. And then we went on to say, and I think pretty clearly took exception to, that the firm had applied the grid differently on other occasions. So I think what you're telling me is that on remand, you've calculated this way where the component parts are separately plugged in pursuant to this left-hand column. Is that right? Yes, Your Honor. Thank you. That's the end of my questions. Thank you. Okay. Thank you very much. My time is up, but we think that the Court and Judge Seaborg fairly construed the fee award within his abuse of discretion. Thank you all very much for your time today. Thank you, Mr. Scarlett. Mr. Clark. Thank you again. Judge Bay was correct. The bid was submitted on a sliding scale marginal rate basis on its express terms because it explicitly relied on the Wonderhold opinion in which a marginal rate bid was awarded by Judge Walker, and they explicitly, that was the only ruling they cited, and that ruling did, or that case did accept a bid on marginal rates, not flat rates. And the difference is the bid would have been, as Judge Bay, you pointed out, $22.1 million, and a 20% of premium applied to that would be approximately $26 million. But even if they hadn't, even if there wasn't that explicit language, and even if it were ambiguous, it's our position that any ambiguity should inure to the benefit of the class and not class counsel. So the district courts, some of the factors that my colleague on the other side referenced were factors that they argued were uncontemplated at the time of the bid. They weren't factors that the court articulated as uncontemplated. Quite the contrary, most of those factors that she named were circumstances which the judge felt would have been contemplated at the time or at the very least should have been contemplated. At the end of the day, essentially what it boiled down to in terms of uncontemplated factors from the judge's perspective was, number one, long and hard fought litigation, which we just don't think there's any way you can say that that was uncontemplated considering the other firms, groups of firms that bid anticipated far more in litigation expenses. And then just the sheer size and nature of the litigation was, it was bound to be a long task, an arduous task. And then otherwise, the district court concluded that the fee, a 20% premium, which in fact is a 40% premium, was justified based on the cumulative effect of the factors without defining what that means and without, we don't have any other individual factors to go on. So as it stands, from our perspective, there's nothing for this court to review in terms of the adjustment upward. The waiver arguments are red herrings. This is going back to the violations of the rules of ethics. We did not challenge the quick pay provision. We're not challenging the quick pay provision. We're challenging what happened with the funds after they were distributed to Huggins Berman. We're also not challenging the terms of the payback provision. The payback provision doesn't say you get to keep vacated attorney's fees. Otherwise, they don't believe, apparently they don't believe that the rules of ethics apply when you have, when Rule 23A governs the adequacy of class counsel. And we believe it's important for this court to explain that they're wrong on that point. And if this court doesn't, then I think it's going to be the standard going forward that if a case is vacated, the attorneys are going to keep those fees and they have no obligations to comply with the California rules of professional conduct and place the funds in client trusts. The State Bar of California didn't see fit to provide a class action exception for the safekeeping rules. And we don't believe this court should either. So we would respectfully request that the court find the violations of the rules of ethics as set forth in the brief and enter an appropriate forfeiture. Alternatively, we would request that the court remand for the district court to consider a forfeiture. And then at a bare minimum, we would ask that the fees be limited to the $22.1 million bid, unless there are any other questions. So I have a question, Mr. Clark. Assuming, for sake of argument for a minute, that the panel is not inclined to remand to consider a forfeiture, but was inclined to think the fees were overstated in some amount, does our panel have the authority under class action law do we have the authority to just set the figure that we think would be the correct figure, or do we have to set out a framework and remand to the district court? I believe the court has the authority to enter a forfeiture based on, we've cited a few cases where that has happened, and there's a Pionville opinion. I think the premise is if we are not inclined to order a forfeiture. If you're not inclined to order a forfeiture? I think that's the premise. I think you may have missed the premise of Judge Gould's question. That was my premise. If the court is not inclined to order a forfeiture? But if we thought the fees should be reduced in some amount, do we have authority to do that, or do we just have to remand? Yes, Your Honor, I believe so. So assuming that the class was entitled to some amount of interest on the $52.8 million before the new award was made, how would we calculate that amount of interest? The interest would be calculated from the entry of each awards based on some interest rate until the date of vacature. I think we calculated that in our brief in a footnote. I'm sorry, I don't have the numbers in my head right now, but I think it's around $600,000 and something. Okay, thank you. Thank you. Well, challenging case. Before we conclude, I want to say, if John Steitler of our IT department is listening, I want to thank you for getting us back on track. Then I want to again thank the advocates here, Mr. Kluwer, Ms. Scarlett, for both for their excellent advocacy, which we really appreciate, and also for their patience in putting up with our technical problems until we could solve them. So without further comment, unless Judge Kristin or Judge Bay have a question, we will submit this case, indirect purchaser class versus Samsung Electronics, and the parties will hear from us in due course on the fees issue. Thank you. All rise. This court for this session stands adjourned.
judges: GOULD, BEA, CHRISTEN